Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

YVETTE CRUZ,

                                    Plaintiff,

          v.

STATE OF NEW JERSEY, *et al.*,

                                    Defendants.

Civil Action No.: 16-0703 (ES) (CLW)

OPINION

SALAS, DISTRICT JUDGE

Plaintiff Yvette Cruz sues Defendants State of New Jersey, New Jersey Department of Children & Families, and Division of Child Protection & Permanency (together, "State Defendants"); and Defendants Susan Tinney-Jones, Maria Ojeda, Loretta Houston, Renetta Aikens, and Linda MacNamara (together, "Individual Defendants"). She claims discrimination on the basis of national origin and retaliation for objecting to and complaining about national origin discrimination. Defendants move for summary judgment. (D.E. No. 114). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.     BACKGROUND[1]

The Court outlines here only the essential and undisputed background. The Court will outline additional facts in its analysis of the issues.

---

[1]     The Court gathers the following facts primarily from the parties' respective statements of facts and responses to the same. (D.E. No. 87-1, Defendants' Statement of Undisputed Facts ("Defs.' SUMF"); D.E. No. 112-2, Plaintiffs' Response to Defendants' SUMF ("Pl.'s Resp."); D.E. No. 102-1, Defendants' Reply to Plaintiff's Response ("Defs.' Reply to Pl.'s Resp."); D.E. No. 112-1, Plaintiff's Counterstatement of Material Facts ("Pl.'s Counterstatement"); D.E. No. 102-2, Defendants' Response to Plaintiff's Counterstatement ("Defs.' Resp.")).

### A.    Factual Background

The Department of Children & Families ("DCF") is a department of the State of New Jersey whose mission is to ensure the safety, well-being, and success of children and families in the State of New Jersey.  (Defs.' SUMF ¶ 2; Pl.'s Resp. ¶ 2).  The Division of Child Protection & Permanency ("DCPP") is an agency within DCF that seeks to ensure the safety and permanency of children and families.  (Defs.' SUMF ¶ 3; Pl.'s Resp. ¶ 3).  To that end, DCPP investigates allegations of child abuse and neglect.  (Defs.' SUMF ¶ 3; Pl.'s Resp. ¶ 3).

On March 12, 2012, DCPP hired Cruz and assigned her to work in the Morris East Local Office ("MELO").  (Defs.' SUMF ¶ 4; Pl.'s Resp. ¶ 4).  During her time at MELO, Cruz worked as an intake worker.  (Defs.' SUMF ¶ 9; Pl.'s Resp. ¶ 9).  In that role, Cruz investigated reports of child abuse by, among other methods, conducting interviews at victims' homes.  (Defs.' SUMF ¶ 13; Pl.'s Resp. ¶ 13).

MELO services clients of different races and national origins and clients who speak different languages.  (Defs.' SUMF ¶ 20; Pl.'s Resp. ¶ 20).  When Cruz applied for her position at DCPP, she represented on her resume that she was bilingual in English and Spanish.  (Defs.' SUMF ¶ 5; Pl.'s Resp. ¶ 5).

Until September 2013, MELO assigned cases to intake workers on a straight-rotation basis. Under that system, new cases were assigned to the worker appearing at the top of the intake-rotation list.  (Defs.' SUMF ¶ 21; Pl.'s Resp. ¶ 21).  The straight-rotation system operated the same regardless of the language proficiency of the intake worker and the client—at times resulting in English-speaking intake workers being assigned to Spanish-speaking clients.  (Defs.' SUMF ¶¶ 21–22; Pl.'s Resp. ¶¶ 21–22).  In that situation and similar ones, MELO had resources in place to facilitate communication, such as contract translators and a telephone-language-line-translation

service.  (Defs.' SUMF ¶ 24; Pl.'s Resp. ¶ 24; Pl.'s Counterstatement ¶ 19; Defs.' Resp. ¶ 19).

In September 2013, Susan Tinney-Jones, the office manager of MELO, held a meeting with Cruz and three other intake workers.  (Defs.' SUMF ¶ 26; Pl.'s Resp. ¶ 26).   Like Cruz, the other three intake workers were Hispanic and bilingual in English and Spanish.  (Defs.' SUMF ¶ 26; Pl.'s Resp. ¶ 26; Pl.'s Counterstatement ¶ 22; Defs.' Resp. ¶ 22).  At the meeting, Tinney-Jones proposed a modification to the straight-rotation system when the incoming case involved a Spanish-speaking family.  (Defs.' SUMF ¶¶ 26–27; Pl.'s Resp. ¶¶ 26–27).  Under the proposed modified-rotation system, MELO would skip non-Spanish-speaking intake workers and assign the Spanish-speaking family to the next Spanish-speaking intake worker.  (Defs.' SUMF ¶ 27; Pl.'s Resp. ¶ 27).  If the next family spoke English, that family would go to the first non-Spanish-speaking intake worker who was previously skipped.  (Defs.' SUMF ¶ 27; Pl.'s Resp. ¶ 27).  The modified system was created solely by Tinney-Jones.  (Pl.'s Counterstatement ¶ 23; Defs.' Resp. ¶ 23).

Cruz objected to the policy, claiming it would impose additional burdens on the four Spanish-speaking workers.  (Defs.' SUMF ¶ 36; Pl.'s Resp. ¶ 36).  Tinney-Jones indicated that they would go forward with the policy anyway and asked the four intake workers to update her in thirty days about whether they received more cases as a result of the modified-rotation system. (Defs.' SUMF ¶¶ 37–39; Pl.'s Resp. ¶¶ 37–39).  The four Spanish-speaking workers never updated Tinney-Jones about their case numbers.  (Defs.' SUMF ¶ 39; Pl.'s Resp. ¶ 39).  Though the four requested a joint meeting in October 2013 to discuss the modified-rotation system, the meeting never happened because the parties disagreed about whether Tinney-Jones should hold individual meetings or one collective meeting.  (Pl.'s Counterstatement ¶ 108; Defs.' Resp. ¶¶ 105–107; D.E. No. 112-5, Ex. 17, Emails, Oct. 23 to 28, 2013).

Cruz claims that after she objected to the modified-rotation system, she was retaliated against by the Individual Defendants—Tinney-Jones, Maria Ojeda, Loretta Houston, Renetta Aikens, and Linda MacNamara.  At some point and in some capacity, each of the Individual Defendants supervised Cruz.  (Defs.' SUMF ¶ 10(b)–(e); Pl.'s Resp. ¶ 10(b)–(e)).  Cruz claims she suffered retaliation in the form of increased hostility, lower performance reviews, micromanagement, heightened scrutiny, severe and disproportionate actions for alleged violations of DCF policy, and a failure to reasonably accommodate a transfer request.

On March 11, 2014, Cruz faxed an anonymous complaint to DCF's internal Equal Employment and Affirmative Action Office ("EEO").  (Defs.' SUMF ¶ 53; Pl.'s Resp. ¶ 53).  In her EEO complaint, she alleged that the modified-rotation system discriminated against her and others based on their national origin.  (Defs.' SUMF ¶ 54; Pl.'s Resp. ¶ 54; D.E. No. 112-5, Ex. 18, Complaint, Mar. 11, 2014).

Cruz claims that the Individual Defendants further retaliated against her for filing the EEO complaint.  On October 6, 2014, Cruz filed a second complaint with the EEO, this time alleging retaliation.  (Defs.' SUMF ¶ 62; Pl.'s Resp. ¶ 62).  On October 23, 2014, Cruz supplemented her second complaint with additional alleged acts of retaliation.  (Defs.' SUMF ¶ 63; Pl.'s Resp. ¶ 63).

The EEO investigated both complaints.  (Defs.' SUMF ¶¶ 56 & 66; Pl.'s Resp. ¶¶ 56 & 66).  On April 1, 2015, the EEO found Cruz's discrimination claim unsubstantiated.  (Defs.' SUMF ¶ 60; Pl.'s Resp. ¶ 60).  On August 31, 2015, the EEO found her retaliation claim unsubstantiated. (Defs.' SUMF ¶ 67; Pl.'s Resp. ¶ 67).

Before the EEO closed its investigation of Cruz's complaint of retaliation, Cruz filed a complaint with the U.S. Equal Opportunity Commission ("EEOC"), alleging discrimination and retaliation.  (Defs.' SUMF ¶ 114; Pl.'s Resp. ¶ 114).  On December 14, 2015, the EEOC issued

4

Cruz a right-to-sue letter.  (Defs.' SUMF ¶ 116; Pl.'s Resp. ¶ 116).

###### B.   Procedural Background

On July 13, 2015, Cruz filed suit against Defendants in New Jersey Superior Court, Law Division, Morris County, raising various claims of discrimination and retaliation.  (D.E. No. 1, Notice of Removal ¶ 2; D.E. No. 1-1, Ex. A, Complaint).  On February 5, 2016, Defendants removed the case to federal court.  (D.E. No. 1, Notice of Removal).  The case was originally assigned to the Honorable Jose L. Linares, United States District Judge (ret.).

On April 4, 2016, Judge Linares granted Defendants' partial motion to dismiss, disposing several of Cruz's claims as insufficiently pleaded.  (D.E. No. 8, Opinion; D.E. No. 9, Order).  In particular, Judge Linares dismissed Cruz's claim of retaliation under the New Jersey Law Against Discrimination ("NJLAD") because that claim was waived under the election-of-remedies provision of the New Jersey Conscientious Employee Protection Act ("CEPA").  (D.E. No. 8, Opinion at 6–9).  Judge Linares also dismissed Cruz's claim of defamation and libel for failure to comply with the notice requirement of the New Jersey Tort Claims Act.  (*Id.* at 4–6).

What remains of Cruz's Complaint are the following claims: (i) against State Defendants, a claim of national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the NJLAD, N.J.S.A. § 10:5–1 *et seq.*; (ii) against State Defendants, a claim of retaliation under Title VII and CEPA, N.J.S.A. § 34:19-1, *et seq.*; and (iii) against Individual Defendants, a claim of national origin discrimination under the NJLAD.  (D.E. No. 1-1, Ex. A, Complaint ¶¶ 22–43).

Defendants move for summary judgment.  (D.E. No. 114).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if the evidence is such that a reasonable jury could find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The burden of establishing the non-existence of a "genuine issue" is on the party moving for summary judgment.  *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party must satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, a court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine

issue for trial.  *Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the fact

finder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.    Discrimination Claims under Title VII and NJLAD

As noted, Cruz claims that State Defendants engaged in national origin discrimination in

violation of Title VII and the NJLAD.  The Court will assess both claims together, primarily

relying on Title VII.  As Defendants point out, "[t]he New Jersey Supreme Court 'has frequently

looked to federal precedent governing Title VII' to interpret and apply the NJLAD."  (D.E. No. 87

("Mov. Br.") at 8 (quoting *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993))).  Though

Title VII and the NJLAD differ under certain circumstances, Cruz does not suggest they differ as

applied to her discrimination claims against State Defendants.  What is more, she identifies her

claims under both statutes as "analogous."  (D.E. No. 112 ("Opp. Br.") at 29).

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or

national origin."  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  It "prohibits both intentional

discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not

intended to discriminate but in fact have a disproportionately adverse effect on minorities (known

as 'disparate impact')."  *Id.*  Cruz raises both theories, and the Court assesses both in turn.

#### (i)    Disparate Treatment

Title VII prohibits employers from making certain employment decisions affecting an

employee because of the employee's national origin.  § 2000e-2.  Key to a disparate treatment

claim is motive and intent.  *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988)

("[T]he plaintiff is required to prove that the defendant had a discriminatory intent or motive.").

A plaintiff can make out a disparate treatment claim under Title VII by relying on direct evidence

of discriminatory motive or intent, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–46 (1989), or indirect and circumstantial evidence through the now-familiar *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### (a)    Direct Evidence

Cruz does not point to direct evidence supporting her claim of intentional discrimination based on national origin. The record shows that Tinney-Jones subjected Cruz and others to differential treatment because of their proficiency in Spanish. That classification is not the same as one based on national origin. *See Paradoa v. Phila. Hous. Auth.*, No. 13-6012, 2014 WL 2476595, at *5 (E.D. Pa. June 2, 2014) ("DeVose's inquiry regarding Paradoa's speaking Spanish at work does not make out a claim of discrimination. Language is not a protected category under Title VII."; collecting cases), *aff'd*, 610 F. App'x 163 (3d Cir. 2015); *Durand v. Excelsior Care Grp. LLC*, No. 19-0810, 2020 WL 7246437, at *6 (E.D.N.Y. Dec. 9, 2020) (same); *Collins v. Beauty Plus Trading Co.*, No. A-2295-09T2, 2012 WL 967596, at *5 (N.J. Super. Ct. App. Div. Mar. 23, 2012) (same but under the NJLAD); *Rosario v. Cacace*, 767 A.2d 1023, 1028 (N.J. Super. App. Div. 2001) (explaining that a language requirement is not discriminatory under the NJLAD unless the "plaintiff . . . could prove that [the] rule was used as a surrogate for discrimination on the basis of national origin, ancestry, or any other prohibited grounds"). Cruz's national origin and language proficiency are not, like other characteristics, "inextricably bound up." *Cf. Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1742 (2020) ("[H]omosexuality and transgender status are inextricably bound up with sex."). People who are Hispanic may not speak Spanish, and people who speak Spanish may not be Hispanic.

To be sure, national origin and language proficiency can be connected. But that means Cruz must provide evidence showing that Tinney-Jones relied on such a connection to treat

Hispanic intake workers differently because they are Hispanic.  While national origin and language proficiency are not inextricably bound up, "under certain circumstances 'evidence of language discrimination may permit a jury finding of national origin or race discrimination -- for example, when it is accompanied by sufficient evidence more directly proving the latter forms of discrimination." *Durand*, 2020 WL 7246437, at *6 (quoting *Panjwani v. Jet Way Sec. & Investigations, LLC*, No. 13-7186, 2016 WL 3675331, at *13 (E.D.N.Y. Feb. 26, 2016), *report and recommendation adopted*, 2016 WL 3702969 (E.D.N.Y. July 7, 2016)); *see also Collins*, 2012 WL 967596, at *5 (similar but under the NJLAD).  And as discussed below in the context of *McDonnell Douglas*, she has not submitted evidence of such a connection.

### (b)     Circumstantial or Indirect Evidence

Under *McDonnell Douglas*, the plaintiff must first show "a prima facie case of discrimination." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).  If the plaintiff does so, the employer must produce "a legitimate reason for its conduct." *Id.*  Following, the burden then shifts back to the plaintiff to "prove that the employer's proffered reason is pretextual." *Id.*

Assuming Cruz makes out a prima facie case, Defendants point to a non-discriminatory, legitimate reason for the differential treatment—that is, to better serve MELO's Spanish-speaking clients.  (Mov. Br. at 11).  In support, Defendants cite Tinney-Jones's deposition testimony. (Defs.' SUMF ¶ 28 (citing D.E. No. 87-3, Ex. H, First Dep. of Tinney-Jones, Sept. 11, 2017 ("First Tinney-Jones Dep."); D.E. No. 87-4, Ex. O, Second Dep. of Tinney-Jones, Feb. 12, 2018 ("Second Tinney-Jones Dep.")).  In her deposition, Tinney-Jones conveyed that her primary objective in implementing the modified-rotation system was to better serve MELO's Spanish-speaking clients. According to Tinney-Jones, MELO "had families where workers felt they had difficulty

communicating with the family even with using the language line." (First Tinney-Jones Dep. at 155:4–6). That difficulty, Tinney-Jones explained, prompted non-Spanish-speaking intake workers to request the assistance of their Spanish-speaking colleagues, which imposed additional burdens on Spanish-speaking intake workers. (*Id.* at 154:16–25 & 155:7–8). She changed the system, she said, because "we felt that it was in the best interest of the family to be assigned to a Spanish-speaking worker." (Second Tinney-Jones Dep. at 77:9–11).

As Defendants point out, Cruz must point to evidence showing these rationales are pretextual. (Mov. Br. at 12). "In order to prove the employer's explanation is pretextual, the plaintiff must 'cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication . . . or . . . allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). "A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either '(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). Cruz fails to satisfy these standards.

*First*, Cruz appears to concede that Tinney-Jones implemented the new policy to better accommodate Spanish-speaking clients. In her response to Defendants' statement of undisputed material facts, Cruz admits that Tinney-Jones "may have been attempting to better help the public by starting the discriminatory case assignment practice." (Pl.'s Resp. ¶ 28). That concession—which bears on Tinney-Jones's motive and intent—could alone resolve Cruz's disparate treatment

claim.  Regardless, the Court addresses Cruz's specific arguments.

*Second*, Cruz argues that Defendants' proffered non-discriminatory reason is pretext because Tinney-Jones changed the policy in order to accommodate a non-Spanish-speaking worker who "did not want to take cases involving Spanish-speaking families." (Opp. Br. at 3).  In support, she cites the EEO's notes of its interview of Shane Burgin, another intake worker, who "suggested that . . . the rotation changes came from a[n] intake supervisor or worker who had complained about having to investigate Spanish speaking cases when they did not speak the language." (D.E. No. 112-5, Ex. 32, EEO Notes, Interview of Burgin, Aug. 13, 2014, at 2).

However, Burgin's statement appears to be speculative.  He does not provide his basis of knowledge.  Moreover, the EEO notes do not indicate that Burgin said anything about national origin—which, as discussed above, is distinct from language proficiency.  Nor do the notes indicate that Burgin said the policy changed *to accommodate* non-Spanish-speaking intake workers—let alone to accommodate non-Hispanic intake workers.  Instead, Burgin appears to have said the policy changed after a non-Spanish-speaking worker complained about the language gap they experienced.  Burgin's theory is thus consistent with changing the policy to better accommodate Spanish-speaking clients.

*Third*, Cruz appears to suggest pretext by claiming that Hispanic workers suffered greater burdens—*i.e.*, a disparate impact—under the new policy.  According to Cruz, Tinney-Jones committed intentional national origin discrimination because all of the Spanish-speaking intake workers were "of Hispanic ethnicity," who "were ostensibly fluent in the Spanish language due to the culture they were raised in." (Opp. Br. at 21).  This theory substantially overlaps with her disparate impact theory.  Accordingly, the Court rejects it here briefly and discuss it more fully in the context of disparate impact.

The disparate impact of which Cruz complains does not reasonably raise the specter of discriminatory motive.  Even if all of the Spanish-speaking intake workers were of Hispanic ethnicity, that does not mean all Hispanic intake workers spoke Spanish.  If Tinney-Jones sought to target Hispanic intake workers, she likely would have implemented a policy that swallowed all Hispanic intake workers—not just the intake workers who spoke Spanish.  Regardless, as discussed more fully below, the record demonstrates that the disparate impact was insubstantial and not obvious.  Case numbers remained in parity, and there is no evidence to suggest Spanish-speaking clients presented more difficult cases.  (Defs.' SUMF ¶¶ 43(a)–(l) & 45; Pl.'s Resp. ¶¶ 43(a)–(l) & 45; D.E. No. 87-4, Ex. P, Caseload Reports).  Moreover, Cruz points only to *one* specific instance where she was denied time off because a Spanish-speaking worker needed to be available.  (D.E. No. 112-5, Ex. 19, Emails, Mar. 11, 2014).  And she does not point to any evidence suggesting Tinney-Jones was aware that the modified-rotation system would make it harder for Hispanic intake workers to take time off or that Hispanic intake workers informed her of that possibility or of that actually happening.

Additionally, the undisputed record evidence shows Tinney-Jones considered the possibility that the new policy would impose additional burdens on Spanish-speaking intake workers.  Before she changed the policy, she held a meeting with the four impacted workers, asking them how they felt about it.  (Defs.' SUMF ¶ 26; Pl.'s Resp. ¶ 26).  Though some complained that the modified-rotation system would impose additional burdens on them, Tinney-Jones asked them to provide her data on their caseloads at the end of the month.  (Defs.' SUMF ¶¶ 37–39; Pl.'s Resp. ¶¶ 37–39).  They never reported back to her with any data.  (Defs.' SUMF ¶ 39; Pl.'s Resp. ¶ 39).  Though the four impacted workers requested a joint meeting in October 2013, that meeting never happened due to disagreement about whether Tinney-Jones should hold individual meetings or

one collective meeting.  (D.E. No. 112-5, Ex. 17, Emails, Oct. 23 to 28, 2013).[2]

*Fourth*, Cruz appears to suggest pretext by arguing there was no reason for the change. She argues there were resources already in place to facilitate communication—such as contract translators and a telephone language line translation service—between non-Spanish-speaking intake workers and Spanish-speaking families.  (Opp. Br. at 3; *see also* Defs.' SUMF ¶ 24; Pl.'s Resp. ¶ 24; Pl.'s Counterstatement ¶ 19; Defs.' Resp. ¶ 19).

However, Cruz concedes that "MELO employees preferred to ask other bilingual intake workers in the office (such as Yvette Cruz) to help them with cases involving non-English[-]speaking families."  (Opp. Br. at 3).  She points out, "[d]espite the availability of the aforementioned resources, intake case workers at MELO would frequently request assistance from Latino, Spanish-speaking coworkers such as Yvette Cruz when they needed to communicate with Spanish-speaking families."  (Pl.'s Counterstatement ¶ 20).  Further, she provides no evidence rebutting the claim that the alternative services presented issues for intake workers and clients. (First Tinney-Jones Dep. at 155:4–6).  Nor does she dispute Tinney-Jones's testimony on this issue.  And Cruz admits that "(1) staff ask[ed] the bilingual staff to go out and translate for them, which was generous of them to do but created additional work for the bilingual staff; [and] (2) staff ha[d] difficulty communicating with families even while using the language line and thus requesting assistance from the bilingual workers."  (Defs.' SUMF ¶ 29; Pl.'s Resp. ¶ 29).

*Fifth*, Cruz asserts that similarly situated intake workers who were proficient in other languages were not subject to a similar modified-rotation system.  (Pl.'s Counterstatement ¶¶ 34

---

[2]    On October 23, 2013, Maria Perez, one of the four Spanish-speaking intake workers, requested a collective meeting between Tinney-Jones and the four Spanish-speaking intake workers.  (D.E. No. 112-5, Ex. 17, Emails, Oct. 23 to 28, 2013).  Tinney-Jones responded that she would meet with the four workers individually on October 29, 2013, and she requested that they bring "logs" to the meetings.  (*Id.*).  Two days later, Perez responded, insisting that they meet collectively.  (*Id.*).  Three days later, Tinney-Jones responded that she would meet with the four individually.  (*Id.*).  Perez declined.  (*Id.*).

& 63).  In support, she cites her own deposition testimony: "Again, the only workers affected by the policy were Hispanic workers.  There is a worker that's Russian and he wasn't forced to take Russian speaking cases.  There is an Indian worker, she wasn't forced or obligated rather to take Hindi cases.  The Caucasian workers are not expected to only interact with the Caucasian families, et cetera, et cetera."  (D.E. No. 112-4, Ex. 2, First Dep. of Cruz, Sept. 8, 2017 ("First Cruz Dep.") at 71:22–72:4).  She also cites the deposition testimony of MacNamara, who indicated that workers who spoke other languages were not subject to a similar modified-rotation system but were rather asked to take clients who spoke a language that they, too, were fluent in.  (D.E. No. 112-4, Ex. 10, Dep. of MacNamara, Jan. 22, 2018, at 71:5–11).

However, Cruz has not reasonably shown that Spanish-speaking intake workers were similarly situated with other bilingual intake workers.  The record shows that MELO had a far larger volume of Spanish-speaking clients than of clients who spoke other non-English languages.  (D.E. No. 87-4, Exhibit P, Caseload Reports at 108–14 (ECF pagination)).  And the record shows that MELO had more Spanish-speaking intake workers than they did workers who could speak other foreign languages.  (*Id.*).  These disparities—more Spanish-speaking clients, and more Spanish-speaking intake workers—elevate the need for a system for Spanish-speaking clients— not only to serve a greater demand but also to ensure fairness among Spanish-speaking intake workers.

In sum, Defendants' have submitted legitimate non-discriminatory reasons for the modified-rotation system, and Cruz has not submitted evidence that would allow a reasonable juror to find pretext.  Defendants are therefore entitled to summary judgment on Cruz's disparate treatment claim.

(ii)   **Disparate Impact**

Title VII lays out the burdens of proof when a plaintiff asserts a disparate impact claim. §
2000e–2(k).   First, a plaintiff makes out a prima facie case of disparate impact by showing her
employer "uses a particular employment practice that causes a disparate impact on the basis of
race, color, religion, sex, or national origin."   § 2000e-2(k)(1)(A)(i).   The employer must then
show "that the challenged practice is job related for the position in question and consistent with
business necessity."   *Id.*   If the employer succeeds in meeting that burden, the plaintiff may still
prevail by pointing to an alternative business practice that the employer refuses to adopt.   § 2000e-
2(k)(1)(A)(ii).

Importantly, "a plaintiff need not necessarily prove intentional discrimination in order to
establish" a disparate impact claim.   *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988).
However, "the necessary premise of the disparate impact approach is that some employment
practices, adopted without a deliberately discriminatory motive, may in operation be functionally
equivalent to intentional discrimination."   *Id.* at 987.   A disparate impact is one that causes "a
*substantial* adverse impact on a protected group."   *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 346
(3d Cir. 1990) (emphasis added); *see also Watson*, 487 U.S. at 994–95 ("Our formulations, which
have never been framed in terms of any rigid mathematical formula, have consistently stressed
that statistical disparities must be sufficiently substantial that they raise such an inference of
causation."); *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 477 (3d Cir. 2011)
("Statistical disparities alone can raise an inference of causation, but only when those disparities
are substantial and the statistical evidence is reliable."); *N.A.A.C.P. v. Med. Ctr., Inc.*, 657 F.2d
1322, 1332 (3d Cir. 1981) (en banc) ("Although the trial court did find that there would be some
effect upon the elderly and minorities because of the travel aspects, those impacts upon patients

15

were described as 'de minimis,' 'insignificant,' and 'minor.' We agree with these characterizations and have serious doubts that such effects are enough to establish a prima facie case of discrimination." (footnote omitted)); *Hashem v. Hunterdon Cty.*, No. 15-8585, 2016 WL 5539590, at *14 (D.N.J. Sept. 29, 2016) ("Under Title VII, a disparate impact violation arises when an employer is shown to have used a specific employment practice, neutral on its face, but causing a substantial adverse impact on a protected group and which cannot be justified as serving a legitimate business goal of the employer.").

Defendants argue that the undisputed record evidence shows that the policy did not impose any impact—let alone a substantial impact—on Hispanic intake workers. Specifically, Defendants argue that while Cruz "makes bold assertions that the new rotation procedure led to increased workloads and various disparities in employment benefits for the Spanish speaking workers, there are absolutely no facts whatsoever supporting such allegations." (Mov. Br. at 12). Rather, "the uncontroverted evidence in this case establishes, in no uncertain terms, that there was no adverse impact on Plaintiff's or any other worker's caseload or any other benefits." (*Id.* (citing Defs.' SUMF ¶¶ 42, 43(a)–(l) & 45)). In support, Defendants cite records reflecting that Spanish-speaking workers were not assigned more cases than non-Spanish-speaking workers between September 2013 to February 2014. (D.E. No. 87-4, Ex. P, Caseload Reports).

Cruz does not contest the underlying data. (Pl.'s Resp. ¶ 43(a)–(l)).[3] Instead, she argues that there were other burdens on Hispanic intake workers that are not reflected by the data. (Opp. Br. at 23). Specifically, she argues that, as a result of the modified-rotation system, Hispanic intake workers dealt with more difficult cases and were unable to take time off from work. (*Id.*). Her

---

[3]     Notably, Defendants' data concerns Spanish-speaking intake workers—not Hispanic intake workers specifically. And Cruz does not provide any data concerning the case numbers of Hispanic intake workers at MELO. In fact, she admits she does not have any documentary evidence showing that Hispanic intake workers had more cases as a result of the modified-rotation system. (Defs.' SUMF ¶ 45; Pl.'s Resp. ¶ 45).

arguments are unconvincing.

*First*, the record does not reasonably support some of Cruz's factual claims.  Cruz maintains that "Hispanic case workers" had "to deal with all of the challenges presented by the case files involving Spanish-speaking families" and "did a higher volume of work and did work that was more difficult."  (Opp. Br. at 23).  However, she offers no evidence that cases involving Spanish-speaking clients were more difficult.  Nor does she offer evidence that, as a result of the modified-rotation system, Hispanic intake workers performed a higher volume of work or more difficult work.

*Second*, of the factual claims supported by the record, a reasonable juror could not find disparate impact.  Cruz maintains that Hispanic "case workers were conscripted to physically staff the MELO office in case their translation services were needed," leaving them "unable to leave when needed to do their field investigations" and to "suffer[] heavy, unequal, and unfair restrictions on their ability to take time off."  (Opp. Br. at 23).   In support, she cites the EEO's notes of its interview of Ojeda, who indicated that the new system "seemed to be unfair to Spanish speaking workers in the intake unit because [Tinney-Jones] always had to keep one or two on the rotation list and it caused problems when workers requested time off."  (D.E. No. 112-5, Ex. 26, EEO Notes, Interview of Ojeda, Aug. 13, 2014, at 3–4).  She also cites an email in which Houston denied Cruz's request to leave work early on March 17, 2014, because she was "the only Spanish-speaking worker for today."  (D.E. No. 112-5, Ex. 19, Emails, Mar. 11, 2014).  But besides what Ojeda believed "seemed" to be the case, and besides the single instance in which Cruz was denied time off, there is no evidence suggesting disparate impact.  The sole instance in which Cruz was denied time off falls woefully short of reasonably supporting a jury finding that there was "a *substantial* adverse impact on a protected group."  *Metal Serv. Co.*, 892 F.2d at 346 (emphasis

added).  Moreover, there is no evidence concerning the impact on Hispanic intake workers specifically—as opposed to Spanish-speaking intake workers.

The Court thus agrees with Defendants that, based on the evidence in the record, a reasonable jury could not find there was a disparate impact on Hispanic intake workers. Defendants are therefore entitled to summary judgment on Cruz's disparate impact claim.[4]

### B.  Retaliation Claims under Title VII and CEPA

As noted, Cruz asserts claims of retaliation under Title VII and CEPA.  The alleged retaliation stems from when Cruz objected to the modified-rotation system in September 2013, filed an anonymous EEO complaint in March 2014, and filed a second EEO complaint in October 2014.

### (i)  Title VII Retaliation

In their moving brief, Defendants did not address Cruz's claim for retaliation under Title VII.  Instead, they only addressed her retaliation claim under CEPA.  They address retaliation under Title VII for the first time in their reply brief—where they challenge the Title VII claim alongside the CEPA claim, arguing a lack of adverse employment action.  (D.E. No. 102 ("Reply") at 12–15).

The Court will not grant judgment to Defendants on Cruz's claim for retaliation under Title VII.  The Court may disregard arguments made for the first time in reply.  *See In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018), *aff'd*, 816 F. App'x 637 (3d Cir. 2020).  The Court is especially inclined to do so here because CEPA and Title VII

---

[4]      Defendants also argue that Cruz's discrimination claims under Title VII and the NJLAD are waived under CEPA's election-of-remedies provision.  (Mov. Br. at 13–18).  In light of the above analysis, the Court finds it unnecessary to consider that argument.  *But see Royster v. New Jersey State Police*, 152 A.3d 900, 909 (N.J. 2017) (explaining that CEPA's election-of-remedies "provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA" and therefore does not apply to a failure-to-accommodate claim brought under the NJLAD (quoting *Young v. Schering Corp.*, 660 A.2d 1153, 1160 (N.J. 1995))).

follow materially different standards when it comes to what constitutes an adverse employment action. *See Skoorka v. Kean Univ.*, No. 09-3428, 2015 WL 3533878, at *20 (D.N.J. June 2, 2015). And Defendants did not address Title VII's standards in their moving brief or reply brief.

"Title VII's definition of retaliatory action is broader than that of CEPA. A particular act might be actionable under Title VII even if it is does not rise to the level of retaliation under CEPA." *Id.* Indeed, Title VII follows a relatively relaxed standard for adverse employment action. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). To allege an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citations omitted). This standard is objective in that it asks what the "*reasonable* employee" would believe. *Id.* And it is fact intensive in that the "significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). For example, while "[a] schedule change in an employee's work schedule may make little difference to many workers," such a change "may matter enormously to a young mother with school-age children," and while "[a] supervisor's refusal to invite an employee to lunch is normally trivial," "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*; *accord Hashmi v. City of Jersey City*, No. 19-18884, 2021 WL 4059852, at *10 (D.N.J. Sept.

7, 2021); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 348 (3d Cir. 2006), *as amended* (Sept. 13, 2006) ("We find that a reasonable jury could conclude that a lateral transfer from the district where a police officer had earned goodwill and built positive relations with the community over time is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad.").

Meanwhile, New Jersey state courts have not adopted the *Burlington Northern* standard under CEPA. *See Frett v. City of Camden*, No. A-1043-14T3, 2016 WL 3502605, at *5 n.1 (N.J. Super. Ct. App. Div. June 28, 2016); *Potena v. State, Bd. of Pub. Utilities*, No. A-3210-08T3, 2011 WL 2713438, at *10 n.8 (N.J. Super. Ct. App. Div. July 14, 2011); *see also Parker v. Atl. City Bd. of Educ.*, No. 15-8712, 2019 WL 6309949, at *3 (D.N.J. Apr. 7, 2019) (distinguishing CEPA from Title VII). Unlike Title VII, and as discussed more fully below, "'[r]etaliatory action' is defined by [CEPA] as 'discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" *Frett*, 2016 WL 3502605, at *4 (quoting N.J.S.A. § 34:19-2(e)).

Defendants did not address the *Burlington Northern* standard—either in their moving brief or in reply—leaving the Court unable to analyze Cruz's claim under Title VII. Therefore, based on Defendants' insufficient briefing, the Court is constrained to permit Cruz's Title VII claim to survive summary judgment.

### (ii)   CEPA

To bring a CEPA claim, a plaintiff must demonstrate four elements: "(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3c; (3) an adverse employment

action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). Defendants argue that Cruz did not engage in whistle-blowing activity and there was no adverse employment action taken against her within the meaning of CEPA. (Mov. Br. at 21–32). Without deciding whether Cruz engaged in protected activity, the Court addresses adverse employment action.

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. § 34:19-2(e). Accordingly, "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Cokus v. Bristol Myers Squibb Co.*, 827 A.2d 1173, 1180 (N.J. Super. Ct. Law Div. 2002) (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)), *aff'd* 827 A.2d 1098 (N.J. Super. Ct. App. Div. 2003). Indeed, "CEPA's purpose is to prevent retaliatory action against whistle-blowers, it is not to 'assuage egos or settle internal disputes at the workplace.'" *Beasley v. Passaic Cnty.*, 873 A.2d 673, 685 (N.J. Super. Ct. App. Div. 2005) (quoting *Klein v. Univ of Med. & Dentistry*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005)).

Courts have recognized a variety of adverse employment actions under CEPA. Importantly, an employee need not be terminated to suffer an adverse employment action. *See Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 241 (3d Cir. 2016) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005)). Similarly, an employee does not need to suffer financial hardship. *Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d 425, 471 (D.N.J. 2009). Specifically, the acts must have "impacted [] the employee's 'compensation or rank' or be 'virtually equivalent to discharge'" to constitute an adverse employment action. *Fraternal Ord.*

*of Police, Lodge 1*, 842 F.3d at 241 (quoting *Caver*, 420 F.3d at 255).  The Court agrees with Defendants that the record does not support Cruz suffered an adverse employment action under CEPA.

### (a)    Unsupported Claims

Most of Cruz's claims of retaliation are not supported by the evidence.  *First*, Cruz alleges that Tinney-Jones withdrew permission to hold a celebration for Hispanic Heritage Month in retaliation to Cruz blowing the whistle.  (Pl.'s Counterstatement ¶ 68).  However, Cruz subsequently admits that she does not know who ended the celebration for the Hispanic Heritage Month—whether it was Tinney-Jones acting on her own accord or acting at someone's direction from Trenton—and she further admits that MELO later began having a multicultural celebration, which included all cultures. (D.E. No. 102-3, Ex. E, Second Dep. of Cruz, Feb. 12, 2018, at 64:17–65:25).

*Second*, Cruz claims that Tinney-Jones displayed overt favoritism to non-Hispanic workers.  (Pl.'s Counterstatement ¶ 137; First Cruz Dep. at 71:13–72:4 & 73:13–21).  The interview notes that Cruz cites in support indicate that Shane Burgin said that Tinney-Jones "does display favoritism and that certain employees were received better from her than others."  (D.E. No. 112-5, Ex. 32, EEO Notes, Interview of Burgin, Aug. 13, 2014, at 3).  However, Burgin did not provide any specific examples of favoritism.  (*Id.*).  Nor did he suggest that the favoritism was on the basis of whistleblowing activity.  (*Id.*).  As noted, the purpose of CEPA is to prevent retaliation, not to "assuage egos or settle internal disputes in the workplace." *Beasley*, 873 A.2d at 685 (quoting *Klein*, 871 A.2d at 691).

*Third*, Cruz alleges that Hispanic intake workers were under increased scrutiny after she complained about the policy.  (First Cruz Dep. at 74:17–25).  This allegation is vague, and there

is no support in the record that Hispanic workers were under increased scrutiny.[5]   Moreover, as

Defendants point out, Plaintiff was "the lowest position at MELO, just above a trainee," and

therefore "was subject to supervisory oversight of her work." (Reply at 13).  And there is no record

evidence that Plaintiff was subject to greater supervision than a similarly situated employee in her

position.

*Fourth*, and similarly, Cruz also alleges that she experienced a barrage of antagonistic

behavior on the part of the Individual Defendants.  (First Cruz Dep. at 71:13–21, 72:15–16, 73:13–

15, 73:18–21, 74:17–25 & 79:13–17).   But Cruz does not provide any specific examples.[6]   In

---

[5]      To note, "[c]ourts have routinely rejected claims based on these types of micromanagement or work criticisms" under Title VII, which has a broader standard for retaliation than that of CEPA.  *Lassalle v. Port Auth. of N.Y. & N.J.*, No. 12-2532, 2013 WL 6094339, at *12 (D.N.J. Nov. 19, 2013); *Skoorka*, 2015 WL 3533878, at *20.

[6]      Tellingly, opposing counsel asked Cruz to elaborate on her claims of discriminatory practices.  The excerpt below reflects some of the conclusory, vague, nonspecific, and speculative things Cruz cites in support of her claim of antagonistic behavior:

> So at that point in time, from then on in, she started, you know, with her disparaging treatment, she was not greeting us, she was not talking to us, she was very abrupt and short when she would speak to the Hispanic workers, and clearly since we were going to meet with her individually, since she met with us as a group, she just continued the trial practice even though it wasn't a state practice or it's not actual policy.

> ***

> It was disparaging in the cases that were assigned.

> ***

> Hostility, some workers, and I can't say myself, that I was [a]ffected by it, they felt if you were Hispanic you, weren't promoted.

> ***

> But it seems as though not only with this situation but in others, if you are not on Susan's team or if you are not in agreement with her, things don't go well for most.

> ***

> It was just once we went against her idea, or once we spoke up about it, that we were not in agreement, a lot of factors and a lot of different situations changed. Cases were looked into more, she was expecting a lot more in the cases, her expectations exceeded the non[-]Caucasian workers. I can't say if in fact she was delegating or what she was doing behind the scenes, because I am not privy, I don't know.

> ***

23

addition, Cruz alleges she was transferred to a new supervisor, Aikens, with the apparent purpose of making Cruz's job more difficult and unpleasant.  (Pl.'s Counterstatement ¶¶ 152–53). However, in support, she cites her deposition testimony, in which she admits she was only assuming that to be the case, based on the fact there was a "rumor[]" that another worker was placed under Aikens' supervision for retaliatory reasons.  (First Cruz Dep. at 81:10–15).  There is no evidence in the record to support Cruz's assumptions.

*Fifth*, and finally, Cruz alleges that, on several occasions, she was falsely accused of and reprimanded for misconduct.  (Pl.'s Counterstatement ¶¶ 88–89, 145, 148; D.E. No. 112-5, Ex. 25, Pl.'s Suppl. Certification ¶¶ 22–23).  But Cruz does not provide any evidence, besides her own deposition testimony, suggesting she was falsely accused and wrongly reprimanded.  (Pl.'s Counterstatement ¶¶ 145 & 148).  The record suggests, moreover, that her reprimands were substantiated.  For example, Cruz was reprimanded and suspended for misconduct after accompanying Maria Perez on a field visit without prior permission.  Cruz alleges that "no pre-approval is needed to use a buddy on a field visit."  (D.E. No. 112-5, Ex. 25, Pl.'s Suppl. Certification ¶ 20).  However, the DCF field policies Cruz attaches in support state "[s]uch use of a 'teamed field response' or 'buddy', even when required by this policy, must be approved by a supervisor." (D.E. No. 112-5, Ex. 21, NJ DCF Policy Manual at 130 (ECF Pagination)). Additionally, Cruz admits that she accessed her own information in the Department's systems in violation of DCF policy but seeks to justify her conduct on the basis that she asked for certain information to be removed.  (Pl.'s Counterstatement ¶¶ 79–82; First Cruz Dep. at 143:3–13).  Any

---

I am not saying that she didn't create hostility, it was very hostile because she in fact was giving me disciplinary actions or she served me with disciplinary actions based on -- based on what was going on in the office.

(First Cruz Dep. at 71:13–21, 72:15–16, 73:13–15, 73:18–21, 74:17–25 & 79:13–17).

substantiated disciplinary charge is not retaliation under CEPA.  *Smith v. Twp. of E. Greenwich*, 344 F. App'x 740, 749 (3d Cir. 2009) ("[A] properly conducted investigation resulting in substantiated disciplinary charges that establish a valid basis for the complaint is not a retaliatory act under CEPA.").

In sum, Cruz asserts various forms of retaliatory conduct such as Tinney-Jones and others ending Hispanic Heritage Month, favoring non-Hispanic intake workers, imposing increased scrutiny on Spanish-speaking intake workers, transferring Cruz to Aikens's supervision as punishment, and falsely accusing her of misconduct.  But none of these claims are supported by record evidence.

### (b)    Supported Claims

Of Cruz's allegations that are supported by evidence, none rise to an adverse employment action under CEPA as a matter of law.

*First*, Cruz alleges that 48 hours after she submitted her anonymous complaint, Tinney-Jones, visibly angry, demanded that Cruz supply a written statement in connection with an incident that had previously gone unmentioned for months.[7]  (Pl.'s Counterstatement ¶¶ 84–85).  In support,

---

[7]     The incident involved Cruz accessing her own personal information in the DCF computer system.  (Pl.'s Counterstatement ¶ 76).  In particular, Cruz opened files concerning a DCF investigation into the death of her baby daughter.  (*Id.* ¶¶ 77–80).  Cruz took a screenshot of her information and sent it to the IT department at DCF.  (*Id.* ¶ 80).  Cruz ultimately hoped the information would be restricted so that her coworkers could not access it.  (*Id.* ¶ 76).  In early January 2014, Tinney-Jones called Cruz into her office, advised Cruz she violated DCF policy by accessing her own personal records, and requested that Cruz write a statement concerning the incident.  (*Id.* ¶¶ 81 & 83).  Cruz allegedly told Tinney-Jones that she felt hopeless and vulnerable because the information was unrestricted from her coworkers.  (*Id.* ¶ 82).  Cruz did not write the statement, because she was busy with work, but she says there was no deadline for when to write it.  (*Id.* ¶ 83).  Two months later, and 48 hours after Cruz filed her complaint, Tinney-Jones reopened the incident and demanded that she write a statement concerning the incident.  (*Id.* ¶ 75).  While there is no indication that demanding the statement is an adverse employment action under CEPA, Title VII presents a different inquiry.  Indeed, it is possible that the sensitive and perhaps traumatic nature of the statement might well dissuade a reasonable employee in Cruz's position from filing a charge of discrimination.  *See Burlington Northern*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").  While Defendants claim that this incident is not supported by record evidence, Cruz's deposition testimony outlines the sensitive nature of the information and explains that Tinney-Jones asked for the statement in early January 2014, did not revisit the issue for two months, and reopened the matter 48 hours after her initial complaint to the EEO.  (First Cruz Dep. at 144:17–25, 145:4–23 & 148:13–24).

Cruz cites her own deposition testimony and a certification that she prepared in connection with her opposition to summary judgment. However, as discussed above, Cruz's discipline was substantiated. Moreover, while the timing of this incident is plausibly connected to Cruz's complaint, the cited portions of Cruz's deposition testimony merely state that Tinney-Jones asked her to write a statement concerning the incident. (First Cruz Dep. at 144:3–145:23 & 148:4–24). Nothing indicates that having to write the statement impacted Cruz's compensation or rank, nor is there any indication that writing the statement was equivalent to a discharge. *See Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 241 (citing *Caver*, 420 F.3d at 255).

*Second*, Cruz alleges that Aikens treated Cruz in an openly hostile manner by yelling and screaming at her in the office. (Pl.'s Resp. ¶¶ 154–55). In support, Cruz cites to her deposition and states she was treated "cruelly and unprofessionally." (*Id.* ¶¶ 155–56). However, Cruz only cites one instance in which Aikens was "so belligerent and aggressive with Ms. Cruz that Ms. Cruz had to flee from the office." (*Id.*). During this incident, Cruz further alleges that Aikens "grabbed the papers" from Cruz's hands. (First Cruz Dep. at 169:13–14). Cruz speculates that Aikens "was going to physically hurt [her]," but provides no support other than Aikens's demeanor. (*Id.*). This singular incident does not amount to an adverse employment action, because there is no indication that Cruz suffered "lasting prejudice." *See Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 340 (D.N.J. 2000). Instead, Cruz only cites to this singular incident among general allegations that Aikens treated Cruz "cruelly and unprofessionally." (Pl.'s Counterstatement ¶¶ 155–56). Furthermore, there is no indication Aikens's treatment of Cruz impacted Cruz's compensation or rank or was "virtually equivalent to discharge." *See Hancock v. Borough of Oaklyn*, 790 A.2d 186, 193 (N.J. Super. Ct. App. Div. 2005).[8]

---

[8]     As noted, the standard for retaliation under Title VII is broader than that of CEPA. Because the parties did not brief the issue, it is unclear whether this incident, coupled with Tinney-Jones demanding a written statement on

*Third*, Cruz alleges that after she filed a complaint with the EEO, she began to receive poor performance reviews.   Cruz states that she "previously received evaluation scores of mainly threes," which is the highest score, but began "receiving scores of two or lower."   (Pl.'s Counterstatement ¶ 158).[9]   However, the performance reviews she submitted, as Defendants point out, indicate that Cruz's reviews were generally consistent and positive before and after she submitted her complaint.  (D.E. No. 112-4, Ex. 5, Interim and Final Performance Evals., Mar. & Nov. 2013; D.E. No. 112-5, Ex. 16, Interim and Final Performance Evals., Mar. & Oct. 2014 & Mar. 2015).  Cruz received positive overall scores during each evaluation and never received a negative score.  (D.E. No. 112-4, Ex. 5, Interim and Final Performance Evals., Mar. & Nov. 2013, at 98–102 & 105–10; D.E. No. 112-5, Ex. 16, Interim and Final Performance Evals., Mar. & Oct. 2014 & Mar. 2015, at 69–71, 83–90 & 91–96 (ECF Pagination)).  Further, there is no indication that these evaluations impacted Cruz's job security, and Cruz was later granted a transfer request. *See Goode v. Camden City Sch. Dist.*, No. 16-3936, 2019 WL 6243156, at *16 (D.N.J. Nov. 22, 2019); (D.E. No. 112 at 15).

*Fourth*, and finally, Cruz alleges she was retaliated against when Defendants transferred her to an office in Trenton, which extended her commute by two hours.  However, she admits that

---

an incident 48 hours after Cruz's complaint, could rise to the level of adverse employment action under Title VII. *See Skoorka*, 2015 WL 3533878, at *20–21 (holding that defendant's yelling at plaintiff could give rise to retaliation under Title VII, given the "history of complaints and litigation").

[9]     Cruz's interim evaluation in March of 2013 indicates that she received mainly threes and a two in "problem solving."  (D.E. No. 112-4, Ex. 5, Interim and Final Performance Evals., Mar. & Nov. 2013 at 98–102 (ECF Pagination)).  Cruz received twos in every category during her final evaluation in November of 2013. (*Id.* at 105–10 (ECF Pagination)).

During Cruz's interim evaluation in March of 2014, Cruz received mainly twos, but received threes in "timeliness," "customer service," and "teamwork."  (D.E. No. 112-5, Ex. 16, Interim and Final Performance Evals., Mar. & Oct. 2014 & Mar. 2015, at 91–98 (ECF Pagination)).  Cruz received twos in every category during her final evaluation in October of 2014.  (*Id.* at 83–90 (ECF Pagination)).

In Cruz's interim evaluation in March 2015, she received mainly twos but received a three in "problem solving."  (*Id.* at 69–71 (ECF Pagination)).

she requested to be transferred, that she specifically asked to work in either the Resource Unit or the Office of Licensing, that she was offered a position in Somerset in the Resource Unit or in Trenton in the Office of Licensing, that she chose Trenton, and that she was required to commute only once per week.  (Pl.'s Resp. ¶¶ 119–125).  Cruz does not provide any evidence suggesting there was a more convenient location for her to be transferred in light of her request or that the transfer affected the terms and conditions of her employment.  While Cruz claimed in her deposition that MacNamara received a better accommodation than she did, she does not provide any evidence concerning MacNamara's request or her particular circumstances.  (First Cruz Dep. at 49:20–50:2).

In sum, Tinney-Jones demanded that Cruz write a statement about an incident that had previously gone unmentioned for months, Aikens yelled at Cruz and grabbed papers from her on one occasion, Cruz's performance evaluations remained positive after her complaints, and Cruz received a transfer that she requested.  These actions, both singularly and in combination, do not rise to the level of adverse employment action.  There is no indication that these actions impacted Cruz's compensation or rank or were the functional equivalent of discharge.

*     *     *

For the above reasons, Defendants are entitled to summary judgment on Cruz's claim of retaliation under CEPA.

### C.  Individual Liability

#### (i)  Title VII

Defendants argue that Cruz has asserted claims under Title VII against the Individual Defendants and that those claims must be dismissed because Title VII does not support individual liability.  (Mov. Br. at 6).  In opposition, specifically in the table of contents, Cruz says she "is not

pursuing Title VII claims against the [I]ndividual Defendants and is not refuting the Defendants' argument that such claims are not colorable."  (Opp. Br. at i).  The Court agrees with both parties that "individual employees are not liable under Title VII."  *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002).  Accordingly, Defendants are entitled to summary judgment on Cruz's claims under Title VII against the Individual Defendants.

### (ii)    NJLAD

Cruz asserts unlawful national origin discrimination against Individual Defendants under an aiding-and-abetting theory of the NJLAD.  The NJLAD, unlike Title VII, supports individual liability under certain circumstances.  However, "it is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal, here, the employer."  *Failla v. City of Passaic*, 146 F.3d 149, 159 (3d Cir. 1998).  And there is no triable issue on a principal violation of the NJLAD, as discussed above.  Therefore, Individual Defendants are entitled to summary judgment on Cruz's aiding-and-abetting claim.

## IV.    CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.  An appropriate Order follows.


Dated: August 25, 2022

Hon. Esther Salas, U.S.D.J.